UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

LUCIEN JAMAR TRAMMELL                     CIVIL ACTION NO. 14-cv-2477

VERSUS                                    JUDGE HICKS

BURL CAIN                                 MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

Lucien Trammell ("Petitioner") was stopped by a Shreveport police officer, and an altercation ensued. The officer was shot in the face but survived. A Caddo Parish jury convicted Petitioner of attempted first-degree murder. He was also adjudicated a third-felony offender and sentenced to 58 years in prison. His conviction and sentence were affirmed on appeal. State v. Trammell, 78 So.3d 205 (La. App. 2d Cir. 2011), writ denied, 85 So.3d 1269 (La. 2012). A post-conviction application filed in state court was also denied. Petitioner now seeks federal habeas corpus relief on three grounds. For the reasons that follow, it is recommended that his petition be denied.

**Sufficiency of the Evidence**

   A. **Introduction**

Petitioner's first claim is that his conviction for attempted first-degree murder was not supported by sufficient evidence. The first-degree murder statute, La. R.S. 14:30, provides that first-degree murder is the killing of a human being when the offender has a specific

intent to kill or to inflict great bodily harm upon a peace officer engaged in the performance of his lawful duties. An attempt is committed when a person, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object. La. R.S. 14:27. The Louisiana courts have held that an attempted first-degree murder conviction requires proof that the offender had the specific intent to kill, not merely intent to cause great bodily harm. State v. Butler, 322 So.2d 189 (La. 1975).

### B. The Evidence

Officer John Madjerick was working overtime, patrolling an area of Shreveport that had seen a spike in burglaries, and he was tasked with making contact with as many people as he could, obtaining contact information if possible, completing field interview cards, and possibly obtaining fingerprints. Officer Madjerick was in full uniform and driving a marked police car shortly before noon when he saw Petitioner walking in the middle of the street. Madjerick pulled up next to Petitioner with the intent to investigate related to the burglaries, check for warrants, and possibly complete a field interview card. Madjerick got out of his car, and an audio recording system attached to his belt and a video camera in his patrol car were activated.

Madjerick testified that he asked Petitioner to come to the front of his car, but Petitioner stood in place. Madjerick asked again and, when Petitioner did not move, reached out his arm to guide Petitioner to the car. Petitioner resisted and began yelling at someone

down the street. Madjerick suspected this was a distraction attempt, and he noted that Petitioner insisted that he wanted to put his CD player in his pocket, which made the officer concerned for his safety.

Madjerick radioed for another officer to give assistance. Petitioner tried to walk away, and Madjerick grabbed him. Madjerick said his memory was fuzzy at that point, but he remembered Petitioner facing him, pointing something dark at him, and saying to Madjerick, "Give me your gun." Madjerick testified that he responded either, "Come get my gun" or "I'll give you my gun," as he put his hand on his own gun. Madjerick next felt an impact on his face and was knocked to the ground.

Petitioner fled the scene. The bullet entered Madjerick's left cheek, hit his jawbone, fractured a vertebrae, and exited through the back of his head. Miraculously, Madjerick survived and retained function of all limbs.

Keldrick Cornelius was the only eyewitness to the shooting other than Petitioner and the victim. He testified that he knew Petitioner and heard him call his nickname, KC, as he walked down the street. The police officer drove up to Petitioner soon after. Cornelius testified that the officer was telling Petitioner to "come here," but Petitioner did not comply. He said the officer appeared "pretty calm." Cornelius said Petitioner said, "Yeah, now you give me your gun" as he pointed a gun at the officer and then shot the officer. Cornelius said the officer never pointed a gun at Petitioner. The jury was able to listen to Cornelius's first

interview with officers that was recorded soon after the shooting. They were also able to listen to and watch the recordings from Officer Madjerick and his patrol car.

Tori Cason was visiting Cornelius's house, which was near the scene of the shooting, when she heard a gunshot. She looked outside but saw nothing unusual. Soon after, Petitioner knocked on the door, but the persons inside told him he could not come in because Cornelius was not home. Petitioner said the cops were after him, and he acted panicked. Petitioner went to the back of the house, broke a kitchen window, and entered while cutting his arm in the process. Petitioner told Ms. Cason that he had fired a gun but did not shoot anyone, and he got rid of the gun. With police combing the area, Petitioner left and went to the Houston area, where he was later arrested.

Petitioner left his CD player at the scene of the shooting. A fingerprint on it matched Petitioner. Police found a Glock model 27.40 caliber pistol in a nearby vacant lot. Records show that it had been purchased by Petitioner's brother a couple of years earlier. DNA testing on the gun found samples on different parts of it, and neither Petitioner nor Officer Madjerick could be excluded as the source. Madjerick testified that he wore gloves during the entire encounter, which the expert testified would reduce the likelihood he would transfer DNA to the gun, but "blow back" onto a gun is not unusual when a shooting is in close proximity to the victim.

A firearms expert testified that she test fired the weapon, and it worked. She also determined through testing that an empty cartridge found at the scene had been fired from

that gun. She also testified about the safety mechanisms built into a Glock and said that testing showed this pistol required seven pounds of pressure on the trigger to make it fire.

An officer who examined the Glock testified that it had been fired once; the other cartridges remained in the magazine. Officer Madjerick's weapon was found in his holster. It was fully loaded and had not been fired.

A Shreveport detective spoke with Petitioner by telephone before Petitioner was arrested. During the recorded conversation, Petitioner said he wrestled with the officer and pushed him, before running away and hearing shots. Petitioner said he believed the officer or someone else was shooting at him. He did not claim that he shot the officer in self-defense or that the officer accidentally shot himself.

A sheriff's deputy from Texas, who transported Petitioner after his arrest, testified that Petitioner made statements in the car that the officer made note of. He testified that Petitioner said that he did not shoot the law man, he was minding his own business when the cop grabbed him by his jacket, and he took off running and then heard some shots. Petitioner said that someone else must have shot the officer.

Petitioner took the stand is his defense. He testified that he stopped for the officer but did not approach his car. The officer grabbed him and pulled him, which Petitioner said "spooked" him and caused him to pull away. The two began to "tussle," and the officer tried to slam Petitioner on the hood of the car.

Petitioner said he had a gun in his pocket that came out during the tussle, but he did not know how that happened. Petitioner said he was carrying the gun because someone had shot at him a couple of weeks earlier, so he stole the gun from his brother's car for protection. He admitted that he had two prior felony convictions that made it illegal for him to possess a firearm.[1]

Petitioner said the officer grabbed Petitioner's gun, and Petitioner then told the officer twice to give him the gun. Petitioner said that he tried to pull the gun, it went off, and he saw the officer grab his face. Petitioner then took off running and dropped the gun along the way. Petitioner admitted going to Texas, and he admitted that he lied to a detective when he said he heard shots being fired as he ran away. Petitioner said that he never wanted to shoot the officer, and he reasoned that if he had intended to kill the officer he would have shot him multiple times using his several remaining rounds. He said he initially resisted the stop because he was carrying a weapon illegally, and he had a small amount of marijuana. He said he did not stay to try to help the officer because he knew backup had been called, and he thought it would be impossible to explain the circumstances.

### C. Applicable Law

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution,

---

[1] Petitioner went to trial in federal court and was convicted of being a felon in possession of a firearm and ammunition. U.S. v. Trammell, 08-cr-0054.

*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993). And "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." Cavazos v. Smith, 132 S.Ct. 2, 4 (2011).

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). Thus a state-court decision rejecting a sufficiency challenge is reviewed under a doubly deferential standard. It may not be overturned on federal habeas unless the decision was an objectively unreasonable application of the deferential Jackson standard. Parker v. Matthews, 132 S.Ct. 2148, 2152 (2012); Harrell v. Cain, 595 Fed. Appx. 439 (5th Cir. 2015).

**D. Analysis**

The state court adjudicated this claim on direct appeal. The detailed opinion reviewed the facts at length, described the elements of the crime, and applied the Jackson standard.

The only significant issue, then and now, was proof of specific intent to kill. The court noted testimony that it was unlikely the weapon used could have been accidentally fired, and it required seven pounds of pressure on the trigger to fire. The court also noted the testimony of the officer and Mr. Cornelius that Petitioner struggled with the officer, demanded the officer's weapon, and then shot the officer in the face. Petitioner offered contrary testimony, but the jurors had evidence before them that, when taken in the light most favorable to the prosecution, would allow them to find that the State proved beyond a reasonable doubt that Petitioner had the specific intent to kill the officer when he shot him in the face.

The trial evidence allowed grounds for argument to the jury that there was not sufficient evidence of specific intent to kill. Defense counsel did make a lengthy and detailed closing argument in an effort to persuade the jury on that theory. The jury, however, was not persuaded and elected to credit the testimony and circumstantial evidence that supported a finding of specific intent. The state appellate court then applied the deferential <u>Jackson</u> standard and, after a careful review of the record, reached a decision that the verdict must be affirmed.

This court may not overturn that court's decision unless it was an objectively unreasonable application of <u>Jackson</u>. There might have been room for argument at the trial court level, but once the jury made its credibility calls, the state court's application of <u>Jackson</u> was entirely reasonable. There is no basis for this court to overturn the jury's verdict on habeas review.

**Ineffective Assistance of Counsel**

Trial counsel filed a motion to suppress any physical evidence seized as a result of what he alleged was an unlawful seizure of Petitioner when the officer initially stopped him. Tr. 685-86. The trial court held a hearing, heard argument, and denied the motion. Tr. 1170. New counsel was appointed for direct appeal. Petitioner argues that appellate counsel rendered ineffective assistance because he did not raise an issue regarding the denial of his motion to suppress.

The general rule for an ineffective assistance of counsel claim is that Petitioner must establish both that his counsel's performance fell below an objective standard of reasonableness and that, had counsel performed reasonably, there is a reasonable probability that the result in his case would have been different. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984). A defendant also has the right to effective assistance of counsel on direct appeal. Evitts v. Lucey, 105 S.Ct. 830 (1985).

Appellate counsel's performance is also assessed under the Strickland standard. Counsel need not raise every non-frivolous ground of appeal available; he need only perform in a reasonably effective manner. Green v. Johnson, 160 F.3d 1029, 1043 (5th Cir. 1998), citing Evitts v. Lucey, 105 S.Ct. 830 (1985). When a petitioner claims that counsel omitted an issue that should have been argued, the petitioner must show that had the issue been raised there was a reasonable probability that he would have won on appeal. Smith v. Robbins, 120 S.Ct. 746, 764 (2000); Moreno v. Dretke, 450 F.3d 158, 168 (5th Cir. 2006).

Petitioner argues that appellate counsel should have pursued the issue because the officer had no lawful basis to conduct a Terry stop or otherwise detain him. Petitioner does not, however, cite any Louisiana or other authority that appellate counsel could have used to persuade a court that a person who shoots a police officer in the face in response to an unlawful Terry stop is entitled to suppress the evidence of his crime.

Louisiana recognizes a citizen's right to resist an unlawful arrest, but it has held that a citizen does not have the right to resist an unlawful stop-and-frisk by committing a battery on the police officer. State v. Sims, 851 So.2d 1039 (La. 2003). And many courts, state and federal, have held that a person who reacts violently to an illegal search or seizure is not entitled to suppress the evidence of his independent crime. See, e.g., U.S. v. Nooks, 446 F.2d 1283 (5th Cir. 1971) (defendant fired shots at police officers after unlawful arrest); U.S. v. Sprinkle, 106 F.3d 613 (4th Cir. 1997) (defendant fired a gun at officer who did not have reasonable suspicion to justify investigative stop); U.S. v. Waupekenay, 973 F.2d 1533 (10th Cir. 1992) (police illegally entered premises, defendant pointed gun at them); People v. Doke, 171 P.3d 237 (Colo. 2007) (officers arguably illegally entered premises to serve papers, and defendant menaced them with a shotgun); and State v. Panarello, 157 N.H. 204, 949 A.2d 732 (2008) (police made illegal entry, defendant pointed gun at her).

A treatise, Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 11.4(j)(5th ed.), cites those and several other decisions that have addressed similar claims. They generally hold that where there has been a physical attack or threat on

an officer who makes an illegal arrest or search, the evidence of the new crime is admissible. Some courts reason that the attack is a free and independent action separate from any Fourth Amendment violation by the officer. Another rationale is that there is no exploitation of the prior illegality if the evidence of the other crime is admitted, and the purpose and policy grounds for the exclusionary rule do not justify its extension to that extreme. To rule otherwise would give the victims of illegal searches or seizures a license to assault or even murder the police officers involved, which no reasonable application of the exclusionary rule would allow. See also LaFave, § 1.13(b)(5th ed.)

Plaintiff first asserted this Strickland claim in his state post-conviction application. The trial court denied the claim on the grounds that Petitioner "fails to meet the requirements of the Strickland test because he does not demonstrate that there would have been a different outcome" and generally failed to meet his burden of proof. Tr. 2629. The appellate court issued a short opinion that stated the "district court was correct in its determination that the applicant failed to prove that his trial and appellate counsel provided ineffective assistance of counsel." Tr. 2698. The Supreme Court of Louisiana denied writs without comment. Tr. 2732.

Petitioner's claim was adjudicated and denied on the merits by the state court, so 28 U.S.C. § 2254(d) directs that the question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether the determination was unreasonable, which is a substantially higher threshold. Schriro v.

Landrigan, 127 S.Ct. 1933, 1939 ( 2007). The Strickland standard is a general standard that affords the state court latitude to reasonably determine a claim, so the federal court's review is "doubly deferential." Knowles v. Mirzayance,129 S.Ct. 1411, 1420 (2009).

It may be debatable whether the initial stop was constitutional, but Petitioner has pointed to no legal authority that would allow him to respond by shooting the police officer and then suppressing evidence of that crime. Appellate counsel cannot be faulted for not raising a meritless issue, and the state court's rejection of the claim was correct. The state court decisions may have been short, but "Section 2254(d) applies even where there has been a summary denial." Cullen v. Pinholster, 131 S.Ct. 1388, 1402 (2011).

**Multiple Offender Hearing**

Louisiana law allows the prosecutor to seek an enhancement of the sentence for a crime if the prosecutor can show that the defendant has prior felony convictions that meet the requirements of the multiple offender statute. Petitioner was charged with being a "third felony offender" because he had prior convictions of illegal possession of stolen things and possession of cocaine. Petitioner appeared with counsel and entered a plea of guilty to being a third-felony offender, which increased his sentencing exposure from a range of 10 to 50 years for attempted murder to a range of 33⅓ years to 100 years.. The court later imposed a sentence of 58 years.

Petitioner argues that both the trial court and his counsel committed constitutional error because he was not informed of the rights to remain silent and to have a formal hearing

in connection with the multiple offender proceeding. Petitioner first raised this claim in his post-conviction application. The trial court denied the claim with reference to page 5 of the transcript of the hearing. That transcript shows that the judge asked Petitioner if he understood that he had certain legal rights that included "the right to a trial or a hearing before a judge, ... the right to require the State to present evidence beyond a reasonable doubt that you are, in fact, [a third felony offender] ..., and you have the right to remain silent and not give any testimony against yourself." The judge asked Petitioner if he understood those rights, and Petitioner answered, "Yes, sir." Tr. 2432.

Petitioner has nonetheless persisted in asserting this claim. He repeats the same unsupported arguments made in state court, but he offers no explanation for the fact that the record squarely refutes his claim. This court must assess such a claim based solely on the record that was before the state court that decided the claim on the merits. Pinholster, 131 S.Ct. at 1398. Based on that record, the state court's decision was correct. There is no basis for habeas relief with respect to this final claim.

Accordingly,

**IT IS RECOMMENDED** that Petitioner's petition for writ of habeas corpus be denied.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and

recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b). Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 17th day of March, 2017.

Mark L. Hornsby
U.S. Magistrate Judge